## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| JOHN KIRBY, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. 4:22-CV-00347-AGD |
| v. | § | |
| | § | |
| COMMISSIONER, SSA, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff brings this appeal for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") pursuant to 42 U.S.C. § 405(g) denying his claim for benefits. After reviewing the Briefs submitted by the Parties, as well as the evidence contained in the administrative record, the court finds that the Commissioner's decision should be **AFFIRMED**.

## I.   PROCEDURAL HISTORY

On July 17, 2018, Plaintiff John Kirby ("Plaintiff") filed an application for disability benefits under Title II ("Title II") of the Social Security Act (TR 79). Plaintiff's alleged onset of disability date was August 15, 2016 (TR 79). On July 24, 2019, Plaintiff's claim was initially denied (TR 78–86), and upon reconsideration on February 19, 2020, Plaintiff's claim was again denied (TR 87–101). Plaintiff requested an administrative hearing, which was held before an Administrative Law Judge ("ALJ") on May 3, 2021 (TR 13, 197). At the hearing, the ALJ heard testimony from Plaintiff, Plaintiff's attorney representative, and a vocational expert ("VE") (TR 42). On August 3, 2021, the ALJ issued an unfavorable decision denying Plaintiff's application (TR 10–33). Plaintiff requested review of the ALJ's decision by the Appeals Council ("AC") (TR

3). On February 25, 2022, the Administrative Appeals Judge denied Plaintiff's request for review, making the decision of the ALJ final (TR 3).

## II.    STATEMENT OF RELEVANT FACTS

### 1.   *Age, Education, and Work Experience*

Plaintiff was born on July 13, 1965, making him 51 years of age at the time of the alleged onset of his disability (TR 78). Plaintiff's age classification at that time was "closely approaching advanced age" (TR 78); *see* 20 C.F.R. § 404.1563(d). Plaintiff's age classification subsequently changed age category to "advanced age" when he turned 55 in July of 2020 (TR 78); *see* 20 C.F.R. § 404.1563(e). Plaintiff has a college degree in international marketing from Seminole University in Carbondale (TR 50). Plaintiff served in the military from 1988 to 1991 (TR 1480). After completing his service, Plaintiff worked as a pharmaceutical sales representative, a handyman, a trainer for UPS, and at Subway (TR 50–57; 209–212). Plaintiff has not engaged in substantial gainful activity since August 15, 2016, the alleged onset date (TR at 88).

### 2.   *Relevant Medical Records*

Plaintiff alleges disability due to knee issues, arthritis, post-traumatic stress disorder ("PTSD"), alcohol dependence, anxiety, and depression (TR 79). Relevant to these conditions and the arguments raised by Plaintiff are the medical opinions and evaluations from providers Jeanine Kwun, M.D. ("Dr. Kwun"), Laura Sanders, Ph.D. ("Dr. Sanders"), and Joel Forgus, Ph.D. ("Dr. Forgus") (TR 87–100, 1413–19), as summarized below.[1]

---

[1] Other doctors noted in the transcript include Jean Germain, Ph.D., Dennis Pacl, M.D., Charles Overstreet, Ph.D., Rehan Ali, M.D., and William Horstman, M.D. (TR 79–400).

### a.  State Medical Agency Consultants – Drs. Kwun and Forgus

On February 18, 2020, the State Agency Medical Consultants issued Plaintiff's Disability Determination Explanation at the Reconsideration Level (TR 87). The medical consultants reported that Plaintiff had non severe impairment for Dysfunction – Major Joints, Depressive, Bipolar and Related Disorders, and Trauma – and Stressor Related Disorders (TR 92). There had not been any additional change in Plaintiff's physical or mental conditions since the initial evaluation (TR 88).

Dr. Kwun completed Plaintiff's Physical Residual Functional Capacity Assessment ("PRFC") at the Reconsideration level (TR 94–95). Dr. Kwun found Plaintiff has exertional limitations for: occasionally lifting/carrying 20 pounds and frequently for ten pounds; standing and walking with normal breaks for about six hours in an eight-hour workday; sitting with normal breaks for about six hours in an eight-hour workday; push and pull, including operation of hand and/or foot controls is not limited, except as was shown for lifting and carrying (TR 94–95). Dr. Kwun found that Plaintiff has postural limitations for: occasionally climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; and occasionally balancing, stooping, kneeling, crouching, and crawling (TR 95). Dr. Kwun did not find any manipulative, visual, communicative, or environmental limitations (TR 95). Dr. Kwun concluded that Plaintiff demonstrated the maximum sustained work capability for "LIGHT" work (TR 98). Given Plaintiff's age, education, and PRFC, Dr. Kwun determined that Plaintiff is "not disabled" (TR 99).

Dr. Forgus completed Plaintiff's Mental Residual Functional Capacity Assessment ("MRFC") at the Reconsideration level (TR 98–99). Dr. Forgus found that Plaintiff does not have any understanding or memory limitations, but that Plaintiff has concentration and persistence limitations (TR 96). Specifically, Dr. Forgus found the following: Plaintiff's ability to carry out

very short and simple instructions is not significantly limited; Plaintiff's ability to carry out detailed instructions is moderately limited; Plaintiff's ability to maintain attention and concentration for extended periods is moderately limited; Plaintiff's ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances is not significantly limited; and Plaintiff's ability to maintain an ordinary routine without special supervision, ability to work in coordination with or in proximity to others without being distracted, and ability to make simple work-related decisions is not significantly limited (TR 96). Dr. Forgus found the following social interaction limitations: Plaintiff's ability to interact with the general public is not significantly limited; Plaintiff's ability to ask simple questions or request assistance is not significantly limited; Plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes is moderately limited; and Plaintiff's ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness is not significantly limited (TR 97). Dr. Forgus found the following adaptation limitations: Plaintiff's ability to respond appropriately to changes in the work setting is moderately limited; Plaintiff's ability to be aware of normal hazards and take normal precautions is not significantly limited; Plaintiff's ability to travel to unfamiliar places or use public transportation is not significantly limited; and Plaintiff's ability to set realistic goals or make plans independently of others is not significantly limited (TR 97).

### b. Psychological Report – Dr. Sanders

On February 4, 2020, Plaintiff appeared before Dr. Sanders for a Psychological Report (TR 1413–17). Dr. Sanders observed that Plaintiff's appearance was "typical" and that he appeared to be an average height and weight (TR 1414). He wore casual clothing appropriate for the weather

(TR 1414). Plaintiff reported that he drove himself to the appointment, and Dr. Sanders noted that Plaintiff walked with the assistance of a cane (TR 1414). Plaintiff's chief complaint was his inability to hold a job due to nightmares, PTSD, trouble focusing, and high anxiety (TR 1415). As for Plaintiff's history, Dr. Sanders reported the following: Plaintiff moved often as a child due to his father's military career; Plaintiff went to college at Southern Illinois University, then trained with the Army at Fort Knox; Plaintiff served in the Gulf War and was recognized for killing more people than his fellow soldiers; Plaintiff was married for 23 years and has two daughters; Plaintiff and his wife divorced in 2014; Plaintiff lost five close loved ones in the last six years and has called the VA's suicide hotline as a result; and Plaintiff successfully completed a cognitive processing therapy program through the VA and is planning to continue seeking other forms of therapy (TR 1415). Dr. Sanders reported that a typical day for Plaintiff includes sleeping late, and then cleaning his home and caring for his dog (TR 1415). Plaintiff reported having trouble remembering or finding motivation to pay his bills on time (TR 1415). Plaintiff reported living on $1650 a month, and that he visits the food bank monthly (TR 1415). Dr. Sanders noted that Plaintiff's hobbies include visiting his friends, visiting the VFW, reading history-related books, hunting with his crossbow, and fixing his car (TR 1415). Plaintiff reported that he does not use drugs, but he does drink approximately ten beers per evening (TR 1415). Dr. Sanders described Plaintiff's behavior as "very polite" and noted that his eye contact, articulation, and speech were typical (TR 1416). Dr. Sanders stated that Plaintiff's cognitive abilities appeared to be average and that his concentration appeared intact (TR 1416). Plaintiff's memory appeared to be typical, and he was able to identify "some basic items of common knowledge" (TR 1416). Regarding Plaintiff's executive functioning, Dr. Sanders noted that Plaintiff's capacity to identify similarities between two dissimilar items indicated that "his abstract thinking is at the expected level" (TR 1416).

Plaintiff's "affect was stable and positive during the encounter with some brief periods of tearfulness" (TR 1416). Dr. Sanders noted that Plaintiff's thought process was appropriate and that his thought content did not evidence paranoia (TR 1416).

Ultimately, Dr. Sanders diagnosed Plaintiff as meeting the criteria for PTSD, moderate alcohol use disorder, and "major depressive disorder, recurrent, moderate, with anxious distress" (TR 1417). Dr. Sanders estimated a poor prognosis due to the "chronic nature of his mental health disorders and his lack of social support" (TR 1417). As to Plaintiff's functional capacity, Dr. Sanders opined that Plaintiff can understand instructions involving one or two steps but would not be able to complete complex instructions (TR 1417). Dr. Sanders went on to state that Plaintiff would struggle to socially engage with other people in a work setting due to his depressive symptoms (TR 1417). Lastly, Dr. Sanders stated that Plaintiff would struggle to deal with normal pressures in a competitive work setting due to his mental and physical health conditions (TR 1417).

### 3. Hearing Testimony

On May 3, 2021, the ALJ held a Hearing (TR 42–77). At the Hearing, the ALJ questioned Plaintiff and the VE, and Plaintiff's attorney questioned Plaintiff and the VE (TR 42–77).

#### a. Plaintiff's Testimony

In response to the ALJ, Plaintiff answered questions regarding his personal life, his work history, his symptoms, and his limitations related to work and engaging in daily activities (TR 49–65). Plaintiff testified that he has had surgery on his knee, and that at the time of the Hearing he had a torn ACL, a torn MCL, and ligament damage (TR 58). Plaintiff stated further that he wears a knee brace all the time and walks with a cane (TR 58). Plaintiff also testified to less severe issues with his left shoulder, hearing, eyesight, and mobility in his right hand (TR 59–62). When asked about his alcohol dependency, Plaintiff testified that he has been sober for 62 days at the time of

the Hearing, regularly attends Alcoholics Anonymous meetings, and takes medicine to prevent alcohol cravings (TR 62). Plaintiff testified to having a service dog for the last three years (TR 63). Plaintiff testified that he takes medications for anxiety, depression, nightmares, and PTSD (TR 63–64). The ALJ asked Plaintiff if Plaintiff felt that his mental health would prevent Plaintiff from working even if all of Plaintiff's physical health issues were resolved (TR 64). Plaintiff responded "[n]o, I don't think I could. . . I can't concentrate and focus now. I forget things. I have sticky notes and I write everything down. My memory locks up." (TR 64).

When questioned by his attorney, Plaintiff testified that his mental health impacted his daily activities, for example, having trouble following a recipe or avoiding crowded aisles at the grocery store (TR 66). Plaintiff stated that he cooks for himself but made simple meals that did not require him to stand for long periods (TR 66). Plaintiff testified to using his cane every day, including inside of Plaintiff's home (TR 66).

### b.  VE's Testimony

The VE testified about Plaintiff's past employment history, noting two occupations classified as light, one as medium, and one as heavy (TR 70–71). The ALJ posed six hypotheticals to the VE and asked whether a person with such limitations in the hypotheticals could perform Plaintiff's past relevant work (TR 71–74). The VE testified that an individual with the limitations in the first hypothetical would not be able to perform Plaintiff's past work, but had job options in the national economy:

> Q:     All right, thank you. For hypothetical number one, we'll assume an individual of the claimant's age, education and work history and further assume the following limitations. For the first hypothetical, we'll assume less than a full range of medium work, 50 pounds occasionally and 25 pounds frequently for lifting and carrying, sitting, standing and walking six hours each, frequent ramps and stairs, but only occasional ladders, ropes or scaffolds, frequent balancing and stooping, occasional kneeing [sic] and crouching, no crawling.

This person would be limited to frequent interaction with supervisors, but only occasional interaction with coworkers and the public. With all of these limitations, could this person perform any of the past work?

A:     No.

Q:     Could this person perform any other work in the national economy?

A:     Yes, one moment please. Hand packager, 920.587-018, medium, SVP-2, approximately 60,000 jobs nationally. Product packer, 920.687-134, medium, SVP-2, approximately 50,000 jobs nationally. Floor waxer, 381.687-034, medium, SVP-2, approximately 60,000 jobs nationally.

Q:     Has your testimony been consistent with the Dictionary of Occupational Titles?

A:     I believe it has, yes.

(TR 71–72). Next, the VE testified that an individual with the limitations in the second hypothetical had job options in the national economy:

Q:     Assume all limitations given thus far. This person would be limited to simple, routine and repetitive tasks, but not at a production rate pace and simple work-related decisions. Would this person be able to perform any work in the national economy?

A:     The same three jobs and the same numbers.

Q:     And again, has your testimony been consistent with the DOT?

A:     Yes, it has.

(TR 72). The VE then testified that an individual with the limitations in the following hypothetical had job options in the national economy:

Q:     For the next hypothetical, we're going back to hypothetical number one, but we're reducing hypothetical number one to light, 20 pounds occasionally and ten pounds frequently for lifting and carrying. Now, you previously indicated could not perform prior work, is that correct?

A:     That's correct.

Q:     At light, first of all, I'm going to ask you about transferable skills. Would there be any position -- would there be any positions that this person can perform requiring skills obtained in the past work, but no additional skills?

A:     No.

Q:     All right. Would there be light jobs available in the national economy?

A:     Yes, I would suggest retail marker, 209.587-034, light, SVP-2, approximately 100,000 jobs nationally. Photocopy machine operator, 207.685-014, light SVP-3, approximately 9,000 jobs. Or, electrical accessories assembler, 729.687-010, light, SVP-2, approximately 7,500 jobs.

Q:     Again, your testimony has been consistent with the DOT?

A:     Yes.

(TR 73). After the ALJ posed the fourth hypothetical, the VE testified that an individual with the limitations in the fourth hypothetical had job options in the national economy:

Q:     For the next hypothetical, we're going to hypothetical number two adding in light to that hypothetical, 20 pounds occasionally, ten pounds frequently for lifting and carrying. Would the same jobs still be available with the added limitation to simple, routine and repetitive tasks, but not at a production rate pace and simple work-related decisions?

A:     Yes.

Q:     And, has your testimony been consistent with the DOT?

A:     It has.

(TR 73). The VE testified as follows in regard to the fifth hypothetical:

Q:     For the next hypothetical, we are again adding on additional limitations. Assume further that this person would be limited to only four hours of standing and walking. With these added limitations, would there be jobs available in the national economy?

A:     No work at the medium level. At the light level with the other limitations given, the photocopy machine operator and electrical accessories assembler would be appropriate and in the same numbers. The retail marker would not be appropriate.

Q:     Would there be another position still available with the four hours of standing and walking?

A:      I would suggest folding machine operator, 208.685-014, light, SVP-2, approximately 2,000 jobs nationally.

Q:     Now, your testimony regarding availability of jobs with four hours of standing and walking, which is less than the traditional light which wouldn't typically indicate six hours each, based upon what?

A:     Based on observation of these specific jobs and discussions with employers regarding those issues.

(TR 73–74). In response to the ALJ's sixth hypothetical, the VE testified about allowable

off task time:

Q:     For the final hypothetical, I'm going to ask you about off task time and absences. If an individual were to be off task 20 percent of the day and absent two days per month, could they perform any work in the national economy?

A:     No, only one absence per month or ten percent off task time is the limit. Exceeding either of those with any frequency, one would lose their job. Again, this is based on my education, experience and discussion with employers regarding these specific positions.

(TR  74).  Plaintiff's attorney then cross-examined the VE regarding the ALJ's

hypotheticals:

Q:     If we added to hypothetical five, the limitation to standing and walking four hours and the additional limitation of use of a cane, would that affect the jobs and the job numbers?
       . . .

A:     Got it. So, the issue is, let's put it this way, if, in fact, the claimant can stand at a bench or a desk and use the edge of the desk for support so that he has the use of both hands, then, yes, he can perform the three jobs given in the same numbers. If, in fact, he has to standing [sic] holding a cane to maintain balance and not use the edge of the desk or bench, then, no, he cannot perform any other light jobs.

Q:      Thank you. For the jobs that were given in both hypotheticals, what was the source of the job numbers?

A:      Job Browser Pro software program I purchased.

(TR 74–75).

## III.    FINDINGS OF THE ALJ

### 1.  *Sequential Evaluation Process*

Pursuant to the statutory provisions governing disability determinations, the Commissioner has promulgated regulations that establish a five-step process to determine whether a claimant suffers from a disability. 20 C.F.R. § 404.1520. First, a claimant who is engaged in substantial gainful employment at the time of his disability claim is not disabled. *Id.* at § 404.1520(b). Second, the claimant is not disabled if his alleged impairment is not severe, without consideration of his residual functional capacity, age, education, or work experience. *Id.* at § 404.1520(c). Third, if the alleged impairment is severe, the claimant is considered disabled if his impairment corresponds to a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id.* at § 404.1520(d). Fourth, a claimant with a severe impairment that does not correspond to a listed impairment is not considered to be disabled if he can perform his past work based on his residual functional capacity. *Id.* at § 404.1520(e). Finally, a claimant who cannot return to his past work is not disabled if he has the residual functional capacity to engage in work available in the national economy. *Id.* at § 404.1520(f). Under the first four steps of the analysis, the burden lies with the claimant to prove disability, and at the last step, the burden shifts to the Commissioner. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). If at any step the Commissioner finds that the claimant is or is not disabled, the inquiry terminates. *Id.*

### 2.  *The ALJ's Disability Determination*

After hearing testimony and conducting a review of the facts of Plaintiff's case, the ALJ made the following sequential evaluation (TR 13–28). At step one, the ALJ found Plaintiff had not

engaged in substantial gainful activity since August 16, 2016, the date of alleged onset of his

disability (TR 16). At step two, the ALJ found that Plaintiff has severe impairments for PTSD,

alcohol dependence, major depressive disorder, and bilateral degeneration of the knees (TR 16).

At step three, the ALJ found Plaintiff "did not have an impairment or combination of impairments

that meets or medically equals the severity of one of the listed impairments in 20 C.F.R., Part 404,

Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526)" (TR 17). At step four,

the ALJ determined that Plaintiff has the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except he can occasionally lift and carry fifty pounds, frequently lift and carry twenty-five pounds, and can sit, stand, and walk for up to six hours in an eight hour workday. He can frequently climb ramps and stairs but only occasionally climb ladders, ropes, or scaffolds. He can frequently balance and stoop but can only occasionally kneel and crouch and can never crawl. He is limited to frequent interaction with supervisors but only occasional interaction with coworkers and the public.

(TR 20). Continuing the step four analysis, the ALJ determined that Plaintiff is unable to

perform past relevant work (TR 26). Finally, at step five, the ALJ determined that after considering

"the claimant's age, education, work experience, and residual functional capacity, there are jobs

that exist in significant numbers in the national economy that the claimant can perform" (TR 26).

The ALJ found that, based on the VE's testimony, Plaintiff

> would be able to perform the requirements of representative occupations such as hand packager (DOT 920.587-018, SVP 2, unskilled, medium; 60,000 jobs in the national economy), produce packer (DOT 920.687-134, SVP 2, unskilled, medium; 50,000 jobs in the national economy), and floor waxer (DOT 381.687-034, SVP 2, unskilled; 60,000 jobs in the national economy).

(TR 27). Based on this determination, the ALJ concluded Plaintiff was not disabled from

August 16, 2016, through the date of the ALJ's decision, August 3, 2021 (TR 28).

## IV.     STANDARD OF REVIEW

In an appeal under § 405(g), a court "reviews a Commissioner's denial of social security disability benefits 'only to ascertain whether (1) the final decision is supported by substantial evidence and (2) whether the Commissioner used the proper legal standards to evaluate the evidence." *Webster v. Kijakazi*, 19 F.4th 715, 718 (5th Cir. 2021) (quoting *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (quotation marks and citation omitted)); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert denied*, 514 U.S. 1120 (1995); 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). Substantial evidence "need not be a preponderance." *Webster*, 19 F.4th at 718. (quoting *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012)). Conflicts in the evidence are resolved by the ALJ; the court cannot reweigh the evidence or substitute its judgment for that of the Commissioner, though it will scrutinize the record to determine if evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995); *Carry v. Heckler*, 750 F.2d 479, 484 (5th Cir. 1985).

The legal standard for determining disability under the Social Security Act is whether the claimant is unable to perform substantial gainful activity for at least twelve months because of a medically determinable impairment. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see Cook*, 750 F.2d at 393. "Substantial gainful activity" is determined by the five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

## V.     ANALYSIS

The central issue raised by Plaintiff is whether "the ALJ's evaluation of the RFC was deficient and contrary to the evidence" (Dkt. #15 at 8–9). Plaintiff believes the ALJ's disability

determination was contrary to the opinions of Dr. Sanders and the State Agency Medical and Psychological consultants, Dr. Kwun and Dr. Forgus (Dkt. #15 at 8–9). Plaintiff further alleges that the "ALJ erred because the mental RFC does not account for the Plaintiff's 'moderate' deficiencies of adapting or managing oneself" (Dkt. #15 at 8–9).

***The ALJ properly considered the opinions contained in the Medical and Psychological reports and Plaintiff's moderate mental limitations.***

Generally, the RFC is an assessment based on all the relevant evidence of a claimant's maximum ability to do work on a sustained basis in an ordinary work setting despite his or her impairments.[2] 20 C.F.R. § 404.1545(a); *see Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). The RFC is the most a claimant is able to do despite his physical limitations. The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ is not required to incorporate limitations in the RFC she finds unsupported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991); *Kozlowski v. Colvin*, No. 4:13-cv-020-A, 2014 WL 948653, at *7 (N.D. Tex. Mar. 11, 2014). The inquiry for the court is "whether the record as a whole yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *see Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Jones v. Saul*, No. 4:20-CV-00772-BP, 2021 WL 2895867, at *4 (N.D. Tex. July 9, 2021) (finding no error where the ALJ determined that the treating physician's opinion was inconsistent with the record as to the limitations he expressed). The ALJ's RFC decision may be supported by substantial evidence even if she does not specifically articulate all the evidence that

---

[2] When considering a claimant's RFC, the Commissioner assesses an applicant's physical, mental, and sensory abilities, evaluates how those abilities apply to that applicant's work-related functioning, and finally considers whether that applicant can sustain work-related activities in a work setting on a regular and continuing basis. *See* 20 C.F.R. § 404.1545(b)–(d); S.S.R. 96-8p, 1996 WL 374184, at *3–4.

supports her decision, or all the evidence that she rejected. *See Falco v. Shalala*, 27 F.3d 160, 163–64 (5th Cir. 1994) ("The ALJ is bound by the rules of this Court to explain his reasons for rejecting a claimant's complaints of pain. He did so. That he did not follow formalistic rules in his articulation compromises no aspect of fairness or accuracy that this process is designed to ensure.").

### 1. Assessment of Medical Opinion Evidence

The Social Security Administration's new rule for assessing medical opinion evidence governs all claims filed on or after March 27, 2017, including Plaintiff's here. *See* 20 C.F.R. § 404.1520c. The old rule required the ALJ to give a treating physician's opinion "controlling weight" in the absence of specific mitigating factors, and to "always give good reasons" in the determination for the weight given to a treating physician's opinion. *Id.* at § 404.1527(c)(2). The new rule eliminates the "controlling weight" given to treating physicians. *Id.* at § 404.1520c(a). A medical opinion is a statement about what functional limits a claimant may have from an impairment. *Id.* at § 404.1513(a)(2).

The new rule, 20 C.F.R. § 404.1520c, provides that the ALJ will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from the [claimant's] medical sources." *Id.* at § 404.1520c(a).[3] Rather, the ALJ shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1)

---

[3]    In transitioning to the new rule, the administration noted, "[t]he current policies that focus upon weight, including the treating source rule, have resulted in reviewing courts focusing more on whether we sufficiently articulated the weight we gave opinions rather than on whether substantial evidence supports the Commissioner's final decision." *Webster v. Comm'r*, No. 3:19-cv-97-DAS, 2020 WL 760395, at *3 (N.D. Miss. Feb. 14, 2020). "In other words, the new rules are an attempt to eliminate confusion about a hierarchy of medical sources. . . Reviewing courts, therefore, will now look first and foremost simply to whether substantial evidence exists to support an ALJ's opinion and not whether one opinion was correctly weighted in relation to any other(s)." *Id.*

supportability;  (2) consistency;  (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. *Id.* at § 404.1520c(a), (c)(1)–(5). However, supportability and consistency are the most important factors. *See id.* at § 404.1520c(a). Supportability means the degree to which objective medical evidence supports the medical opinion at issue, and consistency looks to the consistency between different medical opinions across the record. *Id.* at § 404.1520c(c)(1)–(2).[4] The new rule also changed the articulation requirements for how the ALJ considers each medical opinion. The new articulation requirements state:

> Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

*Id.* at § 404.1520c(b)(1)-(2); *see Moore v. Comm'r*, No. 3:20-CV-241-SA-DAS, 2021 WL 2834395, at *2 (N.D. Miss. July 7, 2021) (finding that the medical source regulations do

---

[4] "With respect to 'supportability,' 'the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase,'" and consistency is "an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Luckett v. Kijakazi*, No. 4:20-CV-04002, 2021 WL 5545233, at *4 (S.D. Tex. Nov. 26, 2021) (citing 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1)) (quoting *Vellone v. Saul*, No. 1:20-CV-00261-RAK-HP, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021).

not "require the ALJ to expressly address the persuasiveness of every opinion within every report").

### a. The ALJ properly considered the opinion of State Agency Medical Consultant Dr. Kwun.

In her report, Dr. Kwun opined that Plaintiff had the capacity for light work, with occasional postural limitations except for no ladders, ropes, or scaffolds, and no other limitations. (TR 94–95). In response, the ALJ stated:

> The undersigned is unpersuaded by this opinion. First, Dr. Kwun did not have the opportunity to directly observe[] the claimant, no[r] did she have access to the entire record, which, as discussed above, generally reveals mild findings on physical examinations, with only intermittent knee limitations noted. (3F/108; 4F/25, 39, 44, 67; 7F/21, 47, 90, 142, 143).

(TR 25). In analyzing Dr. Kwun's report, the ALJ was not required "to articulate in each determination or decision how [she] considered all of the factors for all of the medical opinions" 20 C.F.R. § 404.1520c(b)(1)-(2); *see Moore*, 2021 WL 2834395, at *2. Nor was the ALJ required to follow a strict formula when discussing how she weighed the factors. *Falco*, 27 F.3d at 164.

Here, the ALJ properly evaluated the persuasiveness of Dr. Kwun's report. First, the ALJ explained how Dr. Kwun's conclusion was inconsistent with the rest of the record (TR 25). Earlier in her decision, the ALJ stated the following about Plaintiff's knee impairment:

> As for the claimant's knee impairment, as discussed above, although the record reveals occasional cane use partially consistent with the claimant's testimony, the record otherwise generally shows him presenting with a normal gait and no assistive device. (3F/37, 108, 250, 271, 275, 362, 383, 440, 482; 4F/25, 70, 180, 196; 7F/90, 93-94, 116; 5F; 7F/47; 10F/128, 134). Imaging of the claimant's knee in the record revealed partial ACL tears, with mild bone marrow edema of the medial tibial plateau, medial meniscal tears, and tricompartmental degenerative changes. (7F/142). Records show the claimant undergoing generally conservative treatment for his knee, including a knee brace, physical therapy, and medication, with physical examinations generally revealing only mild findings, with normal to slightly reduced muscle strength, and grossly normal range of motion, although a

March 2020 physical therapy evaluation revealed significantly decreases hip and knee flexion, joint line tenderness, and an inability to deep squat or single leg balance for more than ten seconds. (3F/108; 4F/25, 39, 44, 67; 7F/21, 47, 90, 142, 143). Recent imaging of the claimant's knee shows bilateral tricompartmental degenerative changes, worse on the right, with moderate to severe joint space narrowing in the medial compartment, mild on the left, and moderate narrowing on the right patellofemoral compartment. (10F/2). Although notes show the claimant putting off surgery, suggesting that surgical intervention has been considered, recent records also show him with no restrictions on weight bearing and only intermittently using a cane. (10F/52, 103). The undersigned also notes that records show the claimant continuing to perform construction work, walking his dog frequently, and riding a bicycle to work, all suggesting greater function in his knee than the claimant's testimony would suggest.  (10F/54).

(TR 23–24). The ALJ summarizes the above passage as "mild findings on physical examinations" with respect to Plaintiff's knee impairment (TR 25). The ALJ notes that this is inconsistent with Dr. Kwun's conclusion that Plaintiff only has the capacity for light work (TR 25).

Second, the ALJ properly analyzed the persuasiveness of Dr. Kwun's report by addressing the supportability factor. The ALJ concluded that Dr. Kwun's report was not persuasive because "Dr. Kwun did not have the opportunity to directly observe[] the claimant, no[r] did she have access to the entire record" (TR 25). Therefore, the ALJ properly evaluated the persuasiveness of Dr. Kwun's report when evaluating Plaintiff's RFC.

Plaintiff also claims that the ALJ improperly substituted her own lay opinion for that of Dr. Kwun. It is well established in the Fifth Circuit that "the determination of residual functional capacity is the sole responsibility of the ALJ." *Taylor*, 706 F.3d at 602–03. Additionally, under the revised regulations for considering opinion evidence, an ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 404.1520c(a). Any statements by Dr. Kwun as to whether Plaintiff can work is opinion evidence,

which "is inherently neither valuable nor persuasive to the issue of whether [claimant is] disabled." *See id.* at § 404.1520b(c). As such, what Plaintiff "characterizes as the ALJ substituting [her] opinion is actually the ALJ properly interpreting the medical evidence to determine his capacity for work." *Taylor*, 706 F.3d at 603.

Moreover, the ALJ properly expanded her review beyond the medical records. The ALJ considered Plaintiff's testimony, stating the following:

> First, the undersigned notes that, as discussed above, there is evidence that he continued to work after the alleged onset date, and the claimant testified that he has looked for work since the alleged onset date as well. Although this work was not SGA, the claimant's ongoing work activity despite his impairments, as well as his continuing to seek employment, suggests that they would not preclude him from working. The undersigned also notes that the claimant was laid off from his job at Subway due to reasons other than his impairment, and although he testified that he would be unable to perform the job, he also testified that he was able to accommodate his limitations on standing while working and also was able to have the help of his service dog. (hearing testimony).

(TR 21). The ALJ also noted that Plaintiff applied for unemployment insurance:

> Finally, although not dispositive, the undersigned notes that the claimant collected unemployment insurance in the third and fourth quarters of 2020. (12D). The fact that the claimant certified to one governmental agency that he was able to work in order to receive monetary benefits and is now certifying to another governmental agency that he is disabled in an effort to receive monetary benefits shows that the claimant believed themselves to be capable of work, which is inconsistent with allegations of an inability to work full-time, and shows that his symptoms are not as severe as their allegations would indicate.

(TR 21). The ALJ cites several Disability Reports and a VA record to explain that "records show the claimant continuing to perform construction[5] work, walking his dog frequently, and

---

[5] In his Reply, Plaintiff notes that the ALJ references a "construction job" six times in her report even though Plaintiff did not testify about working construction at the Hearing, there are no earning records of a construction job, and the VE did not classify a construction job (Dkt. #17 at 2). However, Plaintiff also points out that the general notes for Plaintiff's medical records reference, for example, "side jobs as a construction worker," (TR 1481) and "odd jobs in construction" (TR 1502). Plaintiff argues that "the whole line of discussion is a red herring and should be disregarded when analyzing the suitability of the ALJ's analysis of the Plaintiff's RFC" (Dkt. #17 at 2). Regardless of whether the ALJ's references to construction work were accurate or not, the court finds that the ALJ's RFC was based on substantial evidence.

REPORT AND RECOMMENDATION - Page 19

riding a bicycle to work, all suggesting greater function in his knee than the claimant's testimony would suggest. (10F/54)" (TR 22, 24). The ALJ did not err by fashioning an RFC based on the record as a whole. *See Fleming v. Saul*, No. SA-19-CV-00701-ESC, 2020 WL 4601669, at *7 (W.D. Tex. Aug. 10, 2020) (citing *Taylor*, 706 F.3d at 602–03).

Plaintiff leans heavily on *Garcia*, which is distinguishable from the case at hand. In *Garcia*, the court held that the ALJ opinion was not supported by substantial evidence because "the ALJ rejected all opining physicians, credited no ascertainable portions of their opinions, cited raw medical data, and made judgments regarding Plaintiff's RFC." *Garcia v. Berryhill*, No. 17-CV-263, 2018 WL 1513688, at *3 (W.D. Tex. Mar. 27, 2018). Here, the ALJ was "unpersuaded" by Dr. Kwun's assessment that Plaintiff had the capacity only for light work (TR 25). But, as established above, the ALJ cited numerous sources, including medical data, to support her RFC that Plaintiff had the capacity to perform medium work (TR 21–24). Therefore, the ALJ properly weighed the medical and non-medical evidence[6] in determining Plaintiff's RFC, committing no reversible error.

### 2. *Assessment of Psychological Opinion Evidence*

Federal regulations require that the ALJ follow certain steps when evaluating the severity of mental impairments in claimants ("special technique"). *See* 20 C.F.R. § 404.1520a. In evaluating mental disorders, the ALJ first considers whether a claimant has a medically determinable mental impairment. *See id.* at § 404.1520a(b)(1). If it is determined that a medially

---

[6] Plaintiff also alleges in his Reply that "the inference the ALJ draws from the Plaintiff's unsuccessful work attempts is contrary to Agency policy." (Dkt. #17 at 4). Plaintiff misreads 20 C.F.R. § 404.1574(a)(1). That section states, in relevant part, that "[w]e generally consider work that you are forced to stop or to reduce below the substantial gainful activity level after a short time *because of your impairment* to be an unsuccessful work attempt. Your earnings from an unsuccessful work attempt will not show that you are able to do substantial gainful activity." 20 C.F.R. § 404.1574(a)(1) (emphasis added). Here, Plaintiff stopped working at Subway due to the Covid-19 Pandemic, not his impairment (TR 56). Thus, it was not error for the ALJ to consider Plaintiff's employment at Subway when analyzing his RFC.

determinable mental impairment exists, the ALJ must specify the symptoms, signs, and laboratory findings that substantiate the presence of each impairment. *Id.* at § 404.1520a(b)(1); *Boyd v. Apfel,* 239 F.3d 698, 705 (5th Cir. 2001). Generally, the regulations require the ALJ to evaluate the degree of functional limitations resulting from the claimant's mental impairments pursuant to criteria identified in paragraphs A, B, and sometimes C, of the adult mental disorders contained in the listings for mental disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; 20 C.F.R. § 404.1520a(b) & (c). "Paragraph B" contains four broad functional areas representing a person's mental functioning in a work setting: (1) understand, remember, or apply information; (2) interact with others; (3) concentration, persistence, or pace; and (4) adapt or manage oneself. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; 20 C.F.R. § 404.1520a(c)(3). The ALJ's written decision must incorporate pertinent findings and conclusions based on the special technique and must include a specific finding of the degree of limitation in each of the functional areas described. *See* 20 C.F.R. § 404.1520a(e)(4).

After the ALJ rates the degree of functional limitation resulting from any mental impairment, the ALJ determines the severity of such impairment. *Id.* at § 404.1520a(d). If the degree of functional loss falls below a specified level in each of the four areas, the ALJ must find the impairment is not severe at step two of the sequential evaluation process, which generally concludes the analysis and terminates the proceedings. *Id.* at § 404.1520a(d)(l). If the ALJ finds that the mental impairment is severe at step two, then the ALJ must determine at step three if it meets or equals a listed mental disorder. *Id.* at § 404.1520a(d)(2). To determine if it meets or is equivalent in severity to a listed mental disorder, the ALJ must compare the medical findings about the claimant's impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. *Id.* at § 404.1520a(d)(2). If the impairment is severe but does

not meet or equal a listed mental impairment, then the ALJ must conduct an RFC assessment. *Id.* at § 404.1520a(d)(3); *see Boyd*, 239 F.3d at 705.

> a. **The ALJ properly considered the opinions of Dr. Sanders and State Agency Psychological Consultant Dr. Forgus.**

In his report, Dr. Forgus opined that Plaintiff is moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to respond appropriately to changes in work settings (TR 96–97). Dr. Forgus concluded that Plaintiff was limited to unskilled work because of the limitations (TR 98). In analyzing Dr. Forgus's report, the ALJ stated:

> The undersigned notes that this assessment is somewhat vague as it does not indicate the degree to which the claimant is capable of concentrating, making decisions, interacting with others, or responding to changes, making it difficult to apply to the claimant's residual functional capacity. However, insofar as it supports finding the claimant not disabled with no more than moderate limitations in the "paragraph B" criteria, the undersigned is generally persuaded by this assessment, finding it well explained and supported and generally consistent with the record, noting the generally mild findings on mental status examinations regarding the claimant's memory and concentration abilities. (1F/5; 3F/98, 105; 5F/3, 4; 4F/284, 421-422, 432-433; 5F; 7F/58, 61, 80, 135).

(TR 25). Plaintiff argues that, despite finding Dr. Forgus's opinion generally persuasive, the ALJ failed to account for the limitations noted by Dr. Forgus's report, namely his conclusion that Plaintiff is limited to unskilled work (Dkt. #15 at 13). However, the ALJ points out that Dr. Forgus's report was "somewhat vague" because he did not indicate the degree of Plaintiff's impairment regarding those skills (TR 25). Even so, the ALJ found Dr. Forgus's report to be consistent with other "mild findings on mental status examinations" in the record (TR 25). Moreover, as the Commissioner correctly points out, the ALJ relied on the unskilled jobs the VE identified at the Hearing in reaching her step five conclusion (TR 26–27). Therefore, the ALJ properly accounted for Dr. Forgus's report in reaching her RFC conclusion.

The ALJ also properly considered Dr. Sanders' report. In her report, Dr. Sanders noted that Plaintiff would struggle to deal with normal pressures in a competitive work setting, to follow complex instructions, and to build effective social interactions on a consistent and independent basis with supervisors, coworkers, and the public (TR 1417). In analyzing Dr. Sanders' report, the ALJ stated:

> The undersigned finds this opinion partially persuasive. Although Dr. Sanders's examination of the claimant were somewhat mild, as discussed above, her opinion is generally consistent with her observations and interview of the claimant, noting that she had the opportunity to personally examine the claimant. (5F). However, the limitation to only one to two step instructions is [inconsistent][7] with the record, noting the mental status examinations throughout the record revealing generally mild to normal findings in memory and concentration, including Dr. Sander's own observations of his memory and concentration as "typical" and "intact" respectively. (1F/5; 3F/98, 105; 5F/3, 4; 4F/284, 421-422, 432-433; 5F; 7F/58, 61, 80, 135). Although somewhat vague, noting that Dr. Sanders does not specific a degree of social interaction or difficulty dealing with workplace pressures making her assessment difficulty to apply to the claimant's residual functional capacity, the undersigned generally agrees with these statements insofar as they support moderate limitations in social interaction and adapting and managing oneself. In addition to being supported by Dr. Sanders's observations of the claimant, they are grossly consistent with the record, noting the claimant's difficulty maintaining sobriety throughout the record, his remaining, though significantly decreased, PTSD and depressive symptoms, and his subjective complaints regarding anxiety, particularly with people he does not know well. (hearing testimony; 10F/50, 51 52, 78). The undersigned notes that the claimant's representative, in her brief, stated that Dr. Sanders's opinion was work preclusive, based on a report from Vocational Expert Karen Starr. (12E; 15E). However, the undersigned notes that Ms. Starr acted at the request of the claimant's representative in making this assessment, and is therefore not an independent source. (12E).

(TR 24-25). Plaintiff asserts that the ALJ "neglect[ed] to discuss the entire rejection of Sander's [sic] RFC" (Dkt. # 15 at 14). However, contrary to Plaintiff's argument, the ALJ partially disregarded Dr. Sanders' decision as inconsistent (TR 25). Specifically, the ALJ did not rely on Dr. Sanders' limitation to one to two step instructions because it was inconsistent with the record

---

[7] Plaintiff notes that the ALJ likely omitted the word "inconsistent" by mistake (Dkt. #15 at 14). The Commissioner, in his brief, also reads the word "inconsistent" in this sentence (Dkt. # 16 at 14). Accordingly, the court will proceed with the sentence as modified by the Parties.

showing mental status exams generally revealed normal or mild findings in memory and concentration (TR 24). This includes Dr. Sanders' own observations of Plaintiff, describing his memory and concentration as "'typical' and 'intact' respectively" (TR 24). Therefore, the ALJ properly accounted for Dr. Sanders' report regarding complex instructions in reaching her RFC conclusion.

Plaintiff also argues that the ALJ failed to discuss consistency between Dr. Forgus's and Dr. Sanders' opinions (Dkt. # 15 at 15). However, as established above, the regulations do not "require the ALJ to expressly address the persuasiveness of every opinion within every report." *Moore*, 2021 WL 2834395, at *2. Thus, the ALJ did not commit error by not discussing the claimed consistencies between two psychological reports.

Plaintiff also argues that the ALJ substituted her own lay opinion for that of Dr. Forgus and Dr. Sanders (Dkt. #15 at 15–16). However, "the fact that the ALJ found the opinion persuasive does not obligate the ALJ to incorporate every limitation suggested by the report." *Moore*, 2021 WL 2834395, at *2. The ALJ did not "reject[] the only medical opinions of record, interpret[] the raw medical data, and impose[] a different RFC," as alleged by Plaintiff (Dkt. # 15 at 15). Instead, the ALJ analyzed Dr. Forgus's report as "somewhat vague" and Dr. Sanders' report as partially inconsistent (TR 24–25). The ALJ found both doctors' conclusions that Plaintiff's mental impairments were "mild" persuasive and adopted those findings in her RFC (TR 24–25). Therefore, the ALJ did not substitute her own opinion when analyzing Plaintiff's RFC.

### b. The ALJ properly considered Plaintiff's moderate mental limitations in adapting and managing oneself.

Plaintiff argues that while the ALJ found that Plaintiff had moderate limitations in his ability to adapt and manage oneself, the RFC does not contain such limitations (Dkt. #15 at 17). However, the ALJ concluded that Plaintiff "does not have an impairment or combination of

impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)" (TR 17). In other words, although the ALJ found that Plaintiff has moderate limitations with respect to interacting with others and adapting and managing oneself, these limitations did not satisfy the "paragraph B" criteria (TR 17). Before reciting her RFC, the ALJ noted that the "following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis" (TR 20). As such, the court finds that the ALJ's RFC reasonably incorporates Plaintiff's limitations. *See Dunson v. Berryhill*, No. 7:17-CV-00001-BP, 2018 WL 1427107, at *6 (N.D. Tex. Mar. 22, 2018) (citing *Herrera v. Comm'r*, 406 F. App'x 899, 904 (5th Cir. 2010) (per curiam)) ("The Fifth Circuit has held that an RFC assessment that reasonably incorporates a claimant's limitations is sufficient to uphold an RFC determination."). Therefore, because the ALJ properly considered the opinions contained in the Medical and Psychological reports and Plaintiff's moderate mental limitations, the ALJ did not commit error in determining Plaintiff's RFC.

## VI.   CONCLUSIONS AND RECOMMENDATION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision.

**IT IS SO ORDERED**.

**SIGNED this 30th day of September, 2023.**

AILEEN GOLDMAN DURRETT
UNITED STATES MAGISTRATE JUDGE